UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| MERLE DAVIS and DONALD WEILERSBACHER, on Behalf of Themselves and All Others Similarly Situated,<br><br>        Plaintiffs,<br><br>vs.<br><br>DUNCAN ENERGY PARTNERS L.P., W. RANDALL FOWLER, BRYAN F. BULAWA, WILLIAM A. BRUCKMANN, III, LARRY J. CASEY, RICHARD S. SNELL, DEP HOLDINGS, LLC, and ENTERPRISE PRODUCTS PARTNERS L.P.,<br><br>        Defendants. | § No. 4:11-cv-2486<br>§<br>§ <u>CLASS ACTION</u><br>§<br>§<br>§<br>§<br>§<br>§<br>§ <u>DEMAND FOR JURY TRIAL</u><br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ |

**COMPLAINT FOR VIOLATIONS OF §14(a) AND §20(a) OF THE SECURITIES EXCHANGE ACT OF 1934 AND RULE 14a-9 OF THE U.S. SECURITIES AND EXCHANGE COMMISSION PROMULGATED THEREUNDER AND FOR BREACH OF EXPRESS AND IMPLIED CONTRACTUAL DUTIES**

Plaintiffs, by their attorneys, allege as follows:

**NATURE OF THE ACTION**

1.      Plaintiffs Merle Davis and Donald Weilersbacher ("Plaintiffs") bring this class action both for themselves and on behalf of all unitholders of Duncan Energy Partners L.P. ("Duncan Energy" or the "Company") against Duncan Energy, Duncan Energy's general partner DEP Holdings, LLC ("DEP"), Enterprise Products Partners L.P. ("Enterprise"), and the members of the DEP Board of Directors (the "Board," the "Duncan Energy Board," or the "DEP Board") who

manage and operate Duncan Energy ("Individual Defendants").[1]  This action arises from the fact that Defendants breached and or aided in the other Defendants' breaches of express and implied contractual obligations under the Amended and Restated Agreement of Limited Partnership of Duncan Energy, dated February 5, 2007, and all subsequent amendments thereto (the "LPA") as well as Defendants' violations of §14(a) and §20(a) of the Securities Exchange Act of 1934 (the "1934 Act") and U.S. Securities and Exchange Commission ("SEC") Rule 14a-9 promulgated thereunder. These breaches and legal violations arose in connection with the Defendants' agreement to sell Duncan Energy to Enterprise at an exchange ratio which values the Company at approximately $2.5 billion (the "Proposed Acquisition") as agreed to in the Agreement and Plan of Merger dated April 28, 2011 (the "Merger Agreement").

2.     Enterprise was founded in 1968 by the late Dan L. Duncan.  Duncan Energy went public following a partial spin-off from Enterprise on February 5, 2007.  Duncan Energy engages in gathering, transporting, marketing, and storing natural gas, as well as in transporting and storing natural gas liquids (NGLs) and petrochemicals in the United States.  Duncan Energy owns interests in approximately 11,000 miles worth of natural gas and NGL pipelines.  Realizing that it was a mistake to give up part of Duncan Energy, Enterprise is now seeking to acquire it for an unfair price via an unfair process by way of the Proposed Acquisition.  The Proposed Acquisition is the latest in a series of strategic transactions undertaken by Enterprise in order to expand and consolidate the companies formerly controlled by Dan Duncan.  In 2009, Enterprise merged with TEPPCO Partners, L.P. to create a $30 billion energy partnership.  In 2010, Enterprise acquired its own general partner,

---

[1] The term "Individual Defendants" refers to W. Randall Fowler ("Fowler"), Bryan F. Bulawa ("Bulawa"), William A. Bruckmann, III ("Bruckmann"), Larry J. Casey ("Casey"), and Richard S. Snell ("Snell").  Collectively, Duncan Energy, DEP, Enterprise, and the Individual Defendants are referred to herein as "Defendants."

Enterprise GP Holdings L.P., in a $9 billion transaction.  Now, Enterprise seeks to acquire the minority stake of Duncan Energy that it currently does not control.

3.     When Enterprise's initial offer to acquire Duncan Energy was made public in a February 23, 2011 press release by the Company, there was no doubt that the transaction would be completed and the terms of the deal would not deviate substantially from those in the initial offer given that Duncan Energy's general partner, DEP, is a wholly owned subsidiary of Enterprise.  In addition, Enterprise owns 58% of Duncan Energy's common units.  Further, as detailed below, there is substantial overlap and prevailing conflicts of interest between the directors of DEP and Enterprise.  For instance, defendant Fowler is DEP's President and Chief Executive Officer ("CEO") and also Executive Vice President ("EVP") and Chief Financial Officer ("CFO") of Enterprise Products Holdings LLC ("Enterprise GP"), the general partner of Enterprise.

4.     The Defendants first announced the Proposed Acquisition on April 29, 2011.  The Proposed Acquisition itself is the product of an unfair sales process that seeks to divest Duncan Energy unitholders of their valuable investment in the Company for inadequate consideration. Under the terms of the Proposed Acquisition, Duncan Energy unitholders will receive 1.010 common units of Enterprise ("Enterprise Units") for each common unit of Duncan Energy ("Duncan Energy Units") they own ("Proposed Consideration") which equates to a payment of approximately $43.82 per Duncan Energy Unit – a mere 7.56% premium over Duncan Energy's April 28, 2011, closing price of $40.74.

5.     In pursuing, and ultimately agreeing to, the Proposed Acquisition, Defendants directly breached and/or aided and abetted the other Defendants breaches of the express and implied contractual obligations under the LPA, including the implied duty of good faith and fair dealing owed to Plaintiffs and the proposed Class (as defined herein).  The LPA explicitly requires that a

transaction like the Proposed Acquisition be "fair and reasonable."  In addition, implied in every contract is the covenant of good faith and fair dealing, the applicability of which the Delaware Revised Uniform Limited Partnership Act ("DRULPA") prevents limited partnership agreements like the LPA from eliminating.

6.      Nevertheless, Defendants breached both their express and implied duties in agreeing to the inadequate and unfair Proposed Consideration, failing to adequately shop the Company, agreeing to preclusive deal protection devices in the form of, among other things, a no-solicitation provision in the Merger Agreement, and approving the Proposed Acquisition despite the existence of certain debilitating conflicts of interest.  Importantly, the existence of such conflicts of interest renders inapplicable the LPA's "Special Approval" immunization provisions that Defendants may claim shields them from judicial scrutiny.  As a result of these breaches of their express and implied duties under the LPA (or the aiding and abetting thereof), Defendants have acted with a conscious disregard for the best interests of Duncan Energy and its public unitholders.  Without immediate court intervention, Plaintiffs and the Class will suffer irreparable harm warranting injunctive relief in the form sought herein.

7.      On May 18, 2011, in an attempt to secure unitholder approval of the Proposed Acquisition, the Defendants issued a materially false and misleading Form S-4 (the "S-4") with the SEC.  The S-4, which recommends that Duncan Energy unitholders vote in favor of the Proposed Acquisition, omits and/or misrepresents material information concerning: (i) the Company's financial forecasts; and (ii) the key inputs and assumptions underlying the fairness opinion provided by Morgan Stanley & Co. Incorporated ("Morgan Stanley"), the financial advisor to the Company's Audit, Conflicts and Governance Committee ("Duncan ACG Committee").

8.      Ultimately, in filing the materially false and misleading S-4, the Defendants violated §14(a) and §20(a) of the 1934 Act.  As described more fully herein, the omissions and misrepresentations in the S-4 are material to the impending decision of Duncan Energy unitholders whether to vote in favor of the Proposed Acquisition.  As such, the Defendants' 1934 Act violations threaten unitholders with irreparable harm for which monetary damages are an inadequate remedy. Thus, Plaintiffs seek to enjoin the consummation of the Proposed Acquisition unless and until the Defendants comply with their duties under the 1934 Act to provide Duncan Energy unitholders (in advance of the unitholders vote on the Proposed Acquisition) with all material information about the Company's financial forecasts and the key inputs and assumptions underlying the fairness opinion of Morgan Stanley.

**PARTIES**

9.      Plaintiff Merle Davis is, and has been, a unitholder of Duncan Energy at all relevant times.

10.      Plaintiff Donald Weilersbacher is, and has been, a unitholder of Duncan Energy at all relevant times.

11.      Defendant Duncan Energy is a Delaware limited partnership that provides midstream energy services, including gathering, transportation, marketing, and storage of natural gas, as well as natural gas liquids ("NGL") fractionation and separation, transportation, storage, and petrochemical transportation and storage.  Duncan Energy owns interests in assets located mainly in Louisiana and Texas, including interests in approximately 9,400 miles of natural gas pipelines with a transportation capacity aggregating approximately 7.9 billion cubic feet ("Bcf") per day; more than 1,600 miles of NGL and petrochemical pipelines featuring access to one of the world's largest fractionation complexes at Mont Belvieu, Texas; two NGL fractionation facilities located in south Texas; approximately 18 million barrels ("MMBbls") of leased NGL storage capacity; 8.1 Bcf of leased

natural gas storage capacity; and 34 underground salt dome caverns with more than 100 MMBbls of NGL and related product storage capacity at Mont Belvieu.  Duncan Energy is managed by DEP, which is a wholly-owned subsidiary of Enterprise.  Upon completion of the Proposed Acquisition, Duncan Energy will merge with EPD MergerCo LLC ("MergerCo"), a wholly owned subsidiary of Enterprise.  Duncan Energy's principal executive offices are located at 1100 Louisiana Street, 10th Floor, Houston, Texas. Duncan may be served via its Registered Agent: CT Corporation System, 350 N. Saint Paul St. Ste 2900 Dallas, Texas 75201.

12.     Defendant Fowler is DEP's President and CEO and has been since April 2010 and a director and has been since November 2010.  Fowler is also EVP and CFO of Enterprise GP, the general partner of Enterprise, and has been since August 2007.  Fowler is Vice Chairman and CFO of Enterprise Products Company ("EPCO"), which owns significant equity interests in Duncan Energy and Enterprise, and has been since May 2010 and a director and has been since December 2007.  Fowler was also DEP's EVP and CFO since August 2007 and Senior Vice President ("SVP") and Treasurer from October 2006 to August 2007.  Fowler was EVP and CFO of Enterprise Products GP, LLC ("EPGP"), the former general partner of Enterprise, from August 2007 to November 2010; a director of Enterprise GP from February 2006 to May 2010; and SVP and Treasurer of Enterprise GP from February 2005 to August 2007.  Fowler was also EPE Holdings, LLC's ("EPE Holdings") SVP and CFO August 2005 to August 2007; EPCO's President and CEO from December 2007 to May 2010; and ECPO's CFO from April 2005 to December 2007.  Fowler joined Enterprise as Director of Investor Relations in January 1999. Defendant Fowler may be served at 2218 Bluff Creek Dr., Kingwood, Texas 77345.

13.     Defendant Brian F. Bulawa is DEP's SVP, CFO, and Treasurer and has been since April 2010.  Bulawa is also a DEP director and has been since February 2011.  Bulawa is Enterprise

GP's SVP and Treasurer and has been since October 2009 and EPCO's SVP and Treasurer and has been since May 2010.  Bulawa was also DEP's SVP and Treasurer from October 2009 to April 2010; EPGP's SVP and Treasurer from October 2009 to November 2010; and EPGP's Vice President and Treasurer from July 2007 to October 2009. Defendant Bulawa may be served at 4 Forest Course Way, Kingwood, Texas 77339.

14.     Defendant William A. Bruckmann III is a DEP director and has been since October 2006.  Defendant Bruckmann may be served at 631 Ranger Lane, Longboat Key, Florida 34228.

15.     Defendant Larry J. Casey is a DEP director and has been since October 2006. Defendant Cassey can be served at 17415 Courtney Pine Cir., Spring, Texas 77379.

16.     Defendant Richard S. Snell is a DEP director and has been since January 2010.  Snell was also an EPGP director from June 2000 to February 2006. Defendant Snell may be served at 6207 Holly Springs Dr., Houston, Texas 77057.

17.     Defendant DEP is a Delaware limited liability company and a wholly owned subsidiary of Enterprise.  DEP is Duncan Energy's general partner and is responsible for managing the business and operations of Duncan Energy.   DEP owns 0.7 percent of Duncan Energy. Defendant DEP may be served via its Registered Agent: CT Corporation System, 350 N. Saint Paul St. Ste 2900 Dallas, Texas 75201.

18.     Defendant Enterprise is a Delaware limited partnership and a North American midstream energy company providing a broad range of services to producers and consumers of natural gas, NGLs, crude oil, refined products, and certain petrochemicals.  Enterprise is also a leading developer of pipeline and other midstream energy infrastructure in the continental United States and Gulf of Mexico.  Enterprise beneficially owns 100% of DEP through its wholly owned subsidiary Enterprise Products Operating LLC ("EPO") and it controls approximately 58.5% of the

outstanding common units of Duncan Energy through its affiliate Enterprise GTM Holdings, LP ("GTM").  Enterprise's principal executive offices are located at 1100 Louisiana Street, 10th Floor, Houston, Texas.  Enterprise may be served via its Registered Agent: CT Corporation System, 350 N. Saint Paul St. Ste 2900 Dallas, Texas 75201.

## JURISDICTION AND VENUE

19.    This Court has jurisdiction over all claims asserted herein pursuant to §27 of the 1934 Act for violations of §14(a) and §20(a) of the 1934 Act and SEC Rule 14a-9 promulgated thereunder.  This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331.

20.    Venue is proper in this District because Duncan Energy has its principle place of business in this District.  Plaintiff's claims arose in this District, where most of the actionable conduct took place, where most of the documents are electronically stored and where the evidence exists, and where virtually all the witnesses are located and available to testify at the jury trial permitted on these claims in this Court.  Moreover, each of the Individual Defendants, as officers and/or directors, has extensive contacts with this District.

## BACKGROUND

21.    On Tuesday, February 23, 2011, Duncan Energy issued the following press release announcing that the Company received an offer to sell Duncan Energy to Enterprise (the "Initial Offer").  In particular, the press release stated:

> Duncan Energy Partners L.P. ("Duncan Energy Partners") (NYSE:DEP) today announced that the chairman of the Audit, Conflicts and Governance Committee of the board of directors of Duncan Energy Partners' general partner received a proposal from Enterprise Products Partners L.P. ("Enterprise") (NYSE:EPD) whereby Enterprise and certain affiliates would acquire all of the outstanding publicly-held common units of Duncan Energy Partners through a unit-for-unit exchange. Subject to the satisfactory negotiation and execution of definitive agreements, Enterprise is proposing consideration of 0.9545 Enterprise common units for each issued and outstanding publicly held Duncan Energy Partners common unit. The proposed

transaction would be structured as a merger of Duncan Energy Partners with a wholly owned subsidiary of Enterprise. The consideration represents a value of $42.00 for each Duncan Energy Partners common unit, or a premium of approximately 30 percent, based on the 10-day average closing price of Duncan Energy Partners common units and the closing price of Enterprise common units on February 18, 2011.

"We received Enterprise's merger proposal and will begin our review process," stated William A. Bruckmann, III, chairman of the Audit, Conflicts and Governance Committee of the board of directors of the general partner of Duncan Energy Partners.

Enterprise owns 100 percent of the general partner of Duncan Energy Partners and owns approximately 58 percent of the outstanding common units of Duncan Energy Partners.

22.     Despite being fully aware that the Initial Offer from Enterprise was forthcoming, Duncan Energy only began to solicit a financial advisor and/or Delaware counsel to assist it in evaluating the terms of the Initial Offer after the February 23, 2011 press release was issued.  On March 2 and 7, 2011, the Company chose Potter Anderson & Corroon, LLP ("Potter Anderson") and Morgan Stanley to act as its legal and financial advisors respectively.

23.     On March 9, 2011, the Duncan ACG Committee – which was delegated the responsibility of determining whether to pursue the transaction with Enterprise – first met with Potter Anderson and Morgan Stanley.  For nearly the next three weeks, no further discussions ensued.  Even on March 28, 2011, when the Duncan ACG Committee finally reconvened with its advisors, no presentations were given regarding the fairness of the Initial Offer despite the fact that over a month had passed since it was received.

24.     In early April 2011, Morgan Stanley finally met with the Duncan ACG Committee to discuss the Initial Offer and its thoughts related thereto.   Issues were raised concerning: (i) Enterprise's statement in the Initial Offer that it would not support a sale of Duncan Energy or its assets to any third party; and (ii) the inadequacy of the Proposed Consideration.

25.     In light of these concerns, on April 15, 2011, the Duncan ACG Committee made a counteroffer to Enterprise.  The counteroffer included (i) a significantly higher exchange ratio (from 0.9545 to 1.165 Enterprise Units for each Duncan Energy Unit owned); and (ii) a proposed Merger Agreement provision that would require an affirmative vote in favor of the Proposed Acquisition by a majority of the Company's unitholders not affiliated with Enterprise before such Proposed Acquisition could be consummated (the "Minority Approval Provision").

26.     On April 20, 2011, – only five days after the Duncan ACG Committee counteroffer was proposed – Enterprise rejected the counteroffer and restated its objective of acquiring the Company at the exchange ratio contained in the Initial Offer and without any Minority Approval Provision.

27.     Over the course of the next week, the Duncan ACG Committee engaged in further perfunctory negotiations to, unsurprisingly, no avail.  By April 26, 2011, the Duncan ACG Committee folded on all of its earlier demands by (i) accepting the Proposed Consideration (reflecting only a .0555 increase to the exchange ratio contained in the Initial Offer); and (ii) agreeing to a Merger Agreement that did not contain a Minority Approval Provision.

28.     On or around April 28, 2011, the Duncan ACG Committee determined that the Proposed Acquisition was fair, reasonable, and in the best interests of Duncan Energy and its unitholders.  Accordingly, the Enterprise board and the Duncan Energy Board both approved the terms of the Merger Agreement.  Morgan Stanley also rendered its fairness opinion at that time.

29.     Finally, as long seen as a foregone conclusion to Plaintiffs, the Company issued the following press release on April 29, 2011, announcing that the Defendants had agreed to sell Duncan Energy to Enterprise:

Enterprise Products Partners L.P. (NYSE:EPD) and Duncan Energy Partners L.P. (NYSE:DEP) today announced the execution of a definitive agreement that would result in a merger whereby DEP would become a wholly-owned subsidiary of EPD's operating partnership through a unit-for-unit exchange. Under the terms of the definitive agreement, DEP unitholders would receive 1.01 EPD common units in exchange for each DEP common unit they own at closing, representing a premium of approximately 35 percent based on the closing price of DEP common units on February 22, 2011, the last trading day before EPD announced its initial proposal to acquire all of the common units of DEP owned by the public. Based on the cash distributions to be paid on May 6, 2011 by DEP and EPD, the merger would also result in a 32 percent increase in per unit cash distributions for the unitholders of DEP.

"We are pleased to announce our agreement to combine these two partnerships, in a transaction that would be immediately accretive to Enterprise's distributable cash flow per unit, simplify our commercial activities and organizational structure as well as lower our overall cost of financing, while at the same time providing an attractive premium to DEP's public unitholders," said Michael A. Creel, president and chief executive officer of EPD's general partner.

The merger is expected to provide benefits to current EPD unitholders by:

- being immediately accretive in terms of distributable cash flow per EPD common unit;

- simplifying EPD's commercial and organizational structure resulting from EPD's ownership of 100 percent of the equity interests in certain affiliates, which are now jointly owned with DEP, such as Acadian Gas LLC, Enterprise Texas, Enterprise GC and Mont Belvieu Caverns LLC;

- streamlining the Enterprise partnership structure, which reduces complexity, enhances transparency for debt and equity investors and reduces the overall cost of financing;

- maintaining EPD's financial flexibility as the unit-for-unit exchange finances approximately 77 percent of the $3.3 billion purchase (including DEP's indebtedness which is already consolidated on EPD's balance sheet) with EPD equity; and

- reducing general and administrative costs by approximately $2 million per year primarily from eliminating public company expenses associated with DEP.

"We fully support the combination of these two successful partnerships," said W. Randall Fowler, president and chief executive officer of DEP's general partner. "We believe DEP unitholders will benefit from the immediate increase in the value of and the distributions on their EPD common units issued as merger consideration as well as EPD's future growth potential."

The merger is expected to provide benefits to DEP unitholders by:

- providing DEP unitholders with a value premium of approximately 35 percent through the exchange of 1.01 EPD common units for each DEP common unit based on the closing price for DEP common units on February 22, 2011;

- providing DEP unitholders with a substantial increase in distributions, approximately 32 percent based on the 1.01 exchange ratio and the quarterly distribution rates to be paid by DEP and EPD on May 6, 2011;

- providing DEP unitholders more liquidity by exchanging DEP common units for EPD common units, which have approximately 16 times the average daily trading volume of DEP;

- providing DEP unitholders an investment in a partnership with a stronger credit profile. EPD is rated BBB-, Baa3 and BBB- by Fitch Ratings, Moody's Investor Service and Standard & Poor's, respectively, with an average debt maturity of 10 years compared to DEP which is not rated and has an average debt maturity of less than 3 years;

- providing DEP unitholders with an opportunity to benefit from potential unit price appreciation and increased cash distributions through ownership of EPD units; and

- providing DEP unitholders an ownership in a much larger and more diverse partnership as EPD had over $31 billion of consolidated total assets at December 31, 2010 compared to $5.6 billion of consolidated total assets for DEP.

The completion of the merger is subject to approval by a majority of the outstanding DEP common units. A wholly-owned subsidiary of Enterprise owns approximately 58 percent of DEP outstanding common units and has executed a voting agreement to vote in favor of the merger, which is sufficient to satisfy this condition. The completion of the merger is also subject to approval by the affirmative vote of a majority of the votes cast for or against the merger proposal by DEP's unitholders excluding Enterprise and its affiliates. Completion of the merger, assuming the requisite DEP unitholder vote is obtained, is expected to occur during the third quarter of 2011. No vote by EPD unitholders is required.

The members of the Audit, Conflicts and Governance Committee ("ACG Committee") for the general partner of DEP, who evaluated and negotiated the major terms on behalf of DEP, voted unanimously in favor of the merger. The board of directors for the general partner of EPD also voted unanimously in favor of the merger.

30.     Also on April 29, 2011, Duncan Energy filed a Form 8-K with the SEC attaching a copy of the Merger Agreement entered into between the Company and Enterprise.

31.     In conjunction with the Proposed Acquisition, Duncan Energy, Enterprise, and GTM executed an agreement whereby Enterprise has agreed to vote the 58.5% majority of the outstanding Duncan Energy Units owned by GTM through its affiliates in favor of the Proposed Acquisition ("Voting Agreement").

### THE FALSE AND MATERIALLY MISLEADING S-4

32.     On May 18, 2011, less than three weeks after announcing the Proposed Acquisition, the Defendants filed with the SEC the false and misleading S-4 which purports to set forth the reasons why the DEP directors recommend that Duncan Energy unitholders approve the Proposed Acquisition.  Specifically, the S-4 omits and/or misrepresents the material information set forth below in contravention of §14(a) and §20(a) of the 1934 Act.

33.     ***Morgan Stanley's Equity Research Analyst Price Targets Analysis***.  In Morgan Stanley's Equity Research Analyst Price Targets Analysis on pages 55-56 of the S-4, the S-4 fails to disclose (i) the range of observed price targets, and associated discounted price targets, for each of Duncan Energy and Enterprise common units, considering only the analysts that published price targets for both companies; and (ii) how Morgan Stanley arrived at a 10.0% cost of equity.  Without this information, the description of the analysis is materially misleading because unitholders are unable to independently assess whether Morgan Stanley's Equity Research Analyst Price Targets Analysis is an adequate measure by which to evaluate the adequacy of the Proposed Consideration before determining whether to vote on the Proposed Acquisition.

34.     ***Morgan Stanley's Comparable Partnership Trading Analysis***.  In Morgan Stanley's Comparable Partnership Trading Analysis on pages 56-57 of the S-4, the S-4 fails to disclose (i) the actual multiples ranges selected and applied by Morgan Stanley to Duncan Energy and Enterprise; and (ii) the inputs and methodologies used to determine the cost of equity discount range of 10.0%. Without the information set forth above, the description of the analysis is materially misleading

because unitholders are unable to independently understand how the analysis was performed and assess whether Morgan Stanley's Comparable Partnership Trading Analysis is an adequate measure by which to evaluate the Proposed Acquisition before voting thereon. Moreover, this information is relevant for purposes of allowing unitholders to determine what weight, if any, to place on Morgan Stanley's fairness opinion.

35.     ***Morgan Stanley's Discounted Equity Value Analysis.*** In Morgan Stanley's Discounted Equity Value Analysis on pages 57-58 of the S-4, the S-4 fails to disclose (i) the actual long-term growth rates used to derive estimated distributions in 2014 and 2015 for Duncan Energy and Enterprise; (ii) the inputs and methodologies used to determine the cost of equity discount rate range of 9.0% - 11.0%; (iii) the resulting indications of value for Duncan Energy and Enterprise for years 2012 and 2014 using management estimates, IBES Consensus estimates, distribution growth estimates, and adjusted distribution growth estimates; (iv) the resulting implied exchange ratios for years 2012 and 2014; and (v) the companies used to determine the "average" distribution coverage of 1.23x, and what were their individually observed coverage ratios. Without the information set forth above, the description of the analysis is materially misleading because unitholders are unable to understand how the analysis was performed and independently assess whether Morgan Stanley's Discounted Equity Value Analysis is an adequate measure by which to evaluate the adequacy of the Proposed Consideration before determining whether to vote for the Proposed Acquisition.

36.     ***Morgan Stanley's Discounted Cash Flow Analysis.*** In Morgan Stanley's Discounted Cash Flow Analysis on pages 58-59 of the S-4, the S-4 fails to disclose the inputs and methodologies used to determine the cost of equity discount rate range of 9.0% - 11.0% as well as the reason why the selected growth rates of Duncan Energy are 1.0% - 5.0% while those of Enterprise are 2.0% - 5.0%. Because the Discounted Cash Flow Analysis is very sensitive to its inputs, specifically the

discount rates selected, this information is critical to unitholders' understanding of how the analysis was performed.  Without this information, unitholders are unable to independently assess whether the analysis was performed properly, and in turn, what weight, if any, to place on Morgan Stanley's Discounted Cash Flow Analysis (and its fairness opinion generally) when determining whether to vote in favor of the Proposed Acquisition.

37. ***Morgan Stanley's Precedent Transactions Analysis.***  In Morgan Stanley's Precedent Transactions Analysis on pages 59-61 of the S-4, the S-4 fails to disclose the actual premia and the multiple reference ranges selected and applied by Morgan Stanley to Duncan Energy.  Without this information, unitholders are unable to understand how the Precedent Transactions Analysis was performed and independently assess whether Morgan Stanley's analysis is an adequate measure of the Company's value.  This, in turn, prevents unitholders from properly evaluating what weight, if any, to place on Morgan Stanley's Precedent Transactions Analysis when determining whether to vote in favor of the Proposed Acquisition.

38. ***Morgan Stanley's Pro Forma Accretion/Dilution Analysis.*** In Morgan Stanley's Pro Forma Accretion/Dilution Analysis on page 61 of the S-4, the S-4 fails to disclose the magnitude of the observed accretion/dilution (in dollars and percentage), for Duncan Energy and Enterprise, for each year.  Without the information, the description of Morgan Stanley's Pro Forma Accretion/Dilution Analysis is materially misleading because unitholders are unable to understand how the analysis was performed and independently assess whether it is an adequate measure by which to evaluate the sufficiency of the Proposed Consideration being offered before voting on the Proposed Acquisition.

39. ***Certain Financial Projections of Duncan Energy and Enterprise Provided to Morgan Stanley.***  The S-4 fails to disclose the full financial forecasts provided for Duncan Energy

and Enterprise to Morgan Stanley, including (i) distributable cash flow for years 2014-2015; (ii) distributions for years 2011-2015; (iii) FY+1 EBITDA; and (iv) pro forma combined distributable cash flow and distributions for years 2011-2015.  These projections represent Duncan Energy and Enterprise managements' best estimates of the respective companies' future financial performance.  The omission of these projections renders it impossible for Duncan Energy unitholders to compare the Proposed Acquisition with the Company's prospects should it remain independent, and determine which alternative is more favorable.  In addition, without this information, Duncan Energy unitholders are unable to independently assess whether Morgan Stanley's analyses set forth in the S-4, which rely on these projections, adequately assesses the Proposed Acquisition, and in turn, what weight, if any, to place on Morgan Stanley's fairness opinion.

40.     The Defendants were aware of their duty to disclose the foregoing material information in the S-4, and acted with at least negligence in failing to ensure that this material information was disclosed.  Absent disclosure of this material information, unitholders are unable to make an informed decision about whether to vote in favor of the Proposed Acquisition, and are thus threatened with irreparable harm warranting injunctive relief.

### DEFENDANTS' BREACHES OF THE EXPRESS AND IMPLIED LPA PROVISIONS

41.     Section 7.6(e) of the LPA governs DEP's or an affiliate's (i.e., Enterprise) purchase of assets from Duncan Energy.  It provides, in relevant part:

> ***Neither the General Partner nor any of its Affiliates shall sell, transfer or convey any property to, or purchase any property from, a Group Member,[2] directly or indirectly, except pursuant to transactions that are <u>fair and reasonable</u> to the Group Member***; *provided, however*, that the requirements of this <u>Section 7.6(e)</u> shall be deemed to be satisfied as to (i) the transactions effected pursuant to <u>Sections 5.2</u>

---

[2] Duncan Energy is a "Group Member" under the terms of the LPA.

and 5.3 and any other transactions described in or contemplated by the Registration Statement, (ii) any transaction approved by Special Approval, (iii) any transaction, the terms of which are objectively demonstrable to be no less favorable to the [Duncan Energy] than those generally being provided to or available from unrelated third parties, or (iv) any transaction that, taking into account the totality of the relationship between the parties involved (including other transactions that may be particularly favorable or advantageous to the Partnership), is equitable to the [Duncan Energy] ....

LPA, Section 7.6(e) (emphasis added).

42.    Despite this explicit requirement in the LPA, the Proposed Acquisition is neither "fair nor reasonable" to Duncan Energy and its public unitholders for the reasons identified herein.  As such, the Proposed Acquisition has been entered into in direct contravention to the express terms and provisions of the LPA.

43.    Defendants may seek to immunize the Proposed Acquisition from judicial scrutiny by relying solely on the "Special Approval" provision contained in Section 7.9(a) of the LPA.[3]  While

---

[3] Section 7.9(a) of the LPA states, in relevant part:

> Unless otherwise expressly provided in this Agreement or any Group Member Agreement, whenever a potential conflict of interest exists or arises between the General Partner or any of its Affiliates, on the one hand, and the Partnership, any of its Subsidiaries or any Partner, on the other hand, any resolution or course of action by the General Partner or its Affiliates in respect of such conflict of interest shall be permitted and deemed approved by all Partners, and shall not constitute a breach of this Agreement, any Group Member Agreement or of any agreement contemplated herein or therein, or of any duty expressed or implied by law or equity, if the resolution or course of action in respect of such conflict of interest is or, by operation of this Agreement is deemed to be, fair and reasonable to the Partnership; *provided* that, *any conflict of interest and any resolution of such conflict of interest shall be deemed fair and reasonable to the Partnership if such conflict of interest or resolution is (i) approved by Special Approval*, or (ii) on terms no less favorable to the Partnership than those generally being provided to or available from unrelated third parties .... *In the absence of bad faith by the Audit and Conflicts Committee or the General Partner*, the resolution, action or terms so made, taken or provided (including granting Special Approval) by the Audit and Conflicts Committee or the General Partner with respect to such matter shall be conclusive and binding on all Persons (including all Partners) ....

limited partnership agreement provisions similar to Section 7.9(a) of the LPA purport to address the conflicts of interest between Duncan Energy, DEP, and their affiliates, such provisions do not absolve directors or special board committees of their contractual duties to ensure the that the transactions they enter into are "fair and reasonable," nor do they permit the subject entities to enter into transactions subject to significant conflicts of interest like the Proposed Acquisition.

44.     While the LPA defines "Special Approval" as approval by a majority of the members of the Duncan ACG Committee, it does not specify the standards governing the actions, deliberations, or conclusions of the Duncan ACG Committee in granting Special Approval.  At a minimum, Special Approval must be given in compliance with the implied covenant of good faith and fair dealing because the DRULPA mandates that limited partnership agreements, at a minimum, are subject to the implied covenant of good faith and fair dealing. *See* 6 Del. C. § 17 – 1101(d).

45.     As detailed below, approval of the Proposed Acquisition would not have occurred if the Individual Defendants, including both the Duncan ACG Committee and the full Board, had acted in good faith.  By approving the unfair Proposed Acquisition at an inadequate exchange ratio (and also knowing full well of the numerous unresolved conflicts of interest that existed among the entities involved) Duncan Energy, DEP, and the Individual Defendants have breached the implied covenant of good faith and fair dealing contained in the LPA.

46.     Additionally, the LPA imposes certain explicit duties on, among others, the Duncan ACG Committee, DEP, and the Individual Defendants.  Specifically, Section 7.9(g) states that:

> [w]henever a particular transaction, arrangement or resolution of a conflict of interest is required under this Agreement to be "fair and reasonable" to any Person, the fair and reasonable nature of such transaction, arrangement or resolution may be considered by the General Partner or its Board of Directors (or any committee

LPA, Section 7.9(a) (emphasis added).

thereof, including the Audit and Conflicts Committee) *in the context of all similar or related transactions*.

LPA, Section 7.9(g) (emphasis added) (the "Comparable Transactions Clause").

47.     Similarly, the LPA requires that the Duncan ACG Committee determine whether the Proposed Acquisition is on terms *"no less favorable to [Duncan Energy] than those generally ... available from unrelated third parties,"* as another means of satisfying the fair and reasonable requirement contained in Section 7.6(e).  LPA, Section 7.6(e)(iii) (emphasis added) (the "Third Parties Clause").

48.     Here, there is no evidence that the Duncan ACG Committee has even attempted to comply with either the Comparable Transactions Clause or the Third Parties Clause in order to ensure the Proposed Acquisition is "fair and reasonable" to Duncan Energy or its public unitholders. In fact, as discussed in further detail below, the Merger Agreement's preclusive deal protection terms are actually designed to both prevent the gathering of any empirical evidence concerning potentially comparable transactions by means of a market check and to ultimately thwart unsolicited competitive offers.  In other words, DEP and the Individual Defendants have not only undervalued the Company, but they have breached their obligations under the LPA by failing to even negotiate for the best price available to Duncan Energy unitholders.  As a result, the Proposed Acquisition is unfair and unreasonable to the Company.  A prudent fiduciary could not, in good faith, have agreed to the terms of the Merger Agreement and approved the Proposed Acquisition without knowingly and deliberately favoring the interests of Enterprise and its affiliates over the interests of Duncan Energy's public unitholders.

49.     Finally, as detailed further below, the conflicted relationships between the Individual Defendants and the entity defendants, in conjunction with the control exerted by Enterprise over Duncan Energy, DEP, and the Duncan ACG Committee, rendered the Special Approval process of

- 19 -

LPA Section 7.9(a) null and void.  Accordingly, since the Special Approval process did not comply with the terms of the LPA, certain of the Defendants further breached their express contractual duties under the LPA and are therefore subject to liability.

50.     While the April 29, 2011 press release suggests that the Proposed Consideration is generous, it does not represent the true value of the Company's substantial assets and future growth prospects.  If the Proposed Acquisition is consummated, Enterprise will acquire all of the outstanding limited partnership units of Duncan Energy for the grossly unfair consideration of 1.010 Enterprise Units per Duncan Energy unit – a price which fails to fully take into account Duncan Energy's recent financial success (which allowed the price of Duncan Energy Units to climb by 52% over the last twelve months) and its bright future.

51.     For example, on January 14, 2011, the DEP Board announced that it was increasing the Company's cash distribution by 2.2% to $0.455 per common unit.  This was the ninth consecutive quarter in which the Company increased its cash distribution.  Further, on February 17, 2011, Duncan Energy announced record fourth quarter net income of $25 million and a record quarterly gross operating margin of $81.9 million, beating the previous quarter (a prior record high) by 10%.  In addition, in January 2011, the Company began construction of the 270-mile Haynesville Extension of Duncan Energy's Acadian Gas natural gas pipeline system (the "Haynesville Extension").  According to defendant Fowler, the Haynesville Extension is on pace to be completed by September and slated to come in under budget.  The approximate 32% increase in distributions to Duncan Energy unitholders "[b]ased on the [quarterly] cash distributions to be paid by [Enterprise and Duncan] on May 6, 2011," that is touted in the April 29, 2011 press release as justifying the Proposed Consideration does not take into account the major increase in cash flow that is expected with the opening of the Haynesville Extension starting in September 2011. Since the consummation

of the merger is not anticipated to close until the third quarter of 2011, the temporary increase in quarterly cash distributions may be dwarfed by the distributions that Duncan Energy's public unitholders would have received if Duncan Energy remains independent.  This further demonstrates the inadequacy of the Proposed Consideration.

52.     As this information shows, Duncan Energy is well positioned to succeed financially in both the foreseeable and long-term future.  The initiation of the Haynesville Extension renders the prospects of Duncan Energy particularly bright.  That said, the Proposed Consideration agreed to in the Merger Agreement clearly reflects, in part, the desire of Enterprise, which is controlling the process, to acquire Duncan Energy and the valuable Haynesville Extension asset at a price which doesn't adequately reflect the value of that asset.  This calls into question both the desire and ability of the Individual Defendants to secure a transaction that adequately captures the true value of Duncan Energy for the Company's public unitholders.

53.     The market has in fact recognized Duncan Energy's true intrinsic value.  Darren Horowitz of Raymond James Financial, Inc. gives Duncan Energy an "outperform" rating, and John K. Tysseland of Citigroup Inc. and Eduardo Seda of Ladenburg Thalmann & Co. Inc. have consistently recommended holding or buying Duncan Energy Units.  This further evidences that the mere 5% increase between Enterprise's Initial Offer and the ultimately agreed upon Proposed Consideration to be paid to Plaintiffs and the members of the putative Class in the Proposed Acquisition is unfair and grossly inadequate because, among other things, the intrinsic value of Duncan Energy is materially in excess of the amount being offered – especially given Duncan Energy's anticipated growth.

54.     As a consequence of agreeing to the unfair, inadequate, and unreasonable Proposed Consideration as part of the Proposed Acquisition, DEP and the Individual Defendants have

breached the implied covenant of good faith and fair dealing implicit in the LPA. Defendants will be able to proceed with the underpriced and unfair Proposed Acquisition, to the detriment of the Duncan Energy's public unitholders unless enjoined from doing so by the Court.

55. As detailed herein, Enterprise indisputably controls Duncan Energy. Enterprise beneficially owns 100% of DEP through its wholly owned subsidiary, EPO, and it controls approximately 58.5% of the outstanding common units of Duncan Energy through its affiliate, GTM. Furthermore, Enterprise consolidates Duncan Energy's financial statements with its own, and it hosts joint earnings calls with the Company. The existence of Enterprise's control over Duncan Energy is further exemplified in three key ways.

56. First, Duncan Energy, DEP, EPO, Enterprise, Enterprise GP, EPCO, and Dan Duncan LLC are affiliates and are under the collective common control of the DD LLC Trustees[4] and EPCO Trustees.[5]

57. Second, as Duncan Energy's Form 10-K filed with the SEC on March 1, 2011 ("2011 10-K") explains:

> ***We will have inherent conflicts of interest with affiliates of our general partner, including Enterprise.*** These conflicts may cause the ACG Committees of these entities not to approve, or unitholders of these entities to dispute, any transactions that may be proposed or consummated between or among us and these affiliates. This may inhibit or prevent us from consummating transactions, including acquisitions, with them.

---

[4] The DD LLC Trustees include: Randa Duncan Williams, Dan L. Duncan's oldest daughter, who is also a director of Enterprise GP ("Williams"); (ii) Dr. Ralph S. Cunningham, who is a director and the Chairman of Enterprise GP and one of three managers of Dan Duncan LLC ("Cunningham"); and (iii) Richard H. Bachmann ("Bachmann"), who is a director of Enterprise GP and one of three managers of Dan Duncan LLC.

[5] The EPCO Trustees include: (i) Williams, who serves as Chairman of EPCO; (ii) Cunningham, who serves as a Vice Chairman of EPCO; and (iii) Bachmann, who serves as the President and CEO of EPCO. Williams, Cunningham and Bachmann are also currently directors of EPCO. The current EPCO Trustees are the same as the current DD LLC Trustees, who control Dan Duncan LLC.

2011 10-K at 43 (emphasis added).

58.     Third, the 2011 10-K further states:

We have no officers or employees and rely solely on officers of our general partner and employees of EPCO. Certain of our officers are also officers of EPCO and other affiliates of EPCO. These relationships may create conflicts of interest regarding corporate opportunities and other matters, and the resolution of any such conflicts may not always be in our or our unitholders' best interests. In addition, these overlapping officers allocate their time among us, EPCO and other affiliates of EPCO. These officers face potential conflicts regarding the allocation of their time, which may adversely affect our business, results of operations and financial position.

We have entered into the ASA, which governs business opportunities among entities controlled by EPCO, which includes us and our general partner and Enterprise and its general partner.

*Id.*

59.     The aforementioned demonstrates the extent of Enterprise and its affiliates control over Duncan Energy.  As such, Defendants are clearly standing on both sides of the Proposed Acquisition.  Furthermore, because Enterprise, through its affiliates, is a majority unitholder of Duncan Energy, approval of the Proposed Acquisition is essentially guaranteed.

60.     The Individual Defendants have conflicts of interest that put them at odds with Duncan Energy's public unitholders. As discussed above, DEP manages Duncan Energy through its five-member Board. However, a majority of the five-member DEP Board is (or has been) employed by Enterprise and/or its affiliates.

61.     Specifically, individual defendant Fowler has had a longstanding relationship with Enterprise and its affiliates.  He joined Enterprise as Director of Investor Relations in January 1999. He served as EVP and CFO of Enterprise GP since November 2010, and as EVP and CFO of EPGP from August 2007 to November 2010.  Furthermore, Fowler served as EVP and CFO of EPE Holdings from August 2007 to November 2010, and as SVP and Treasurer of Enterprise GP from February 2005 to August 2007.  He served as a director of Enterprise GP and EPE Holdings from

February 2006 to May 2010.  He also served as SVP and CFO of EPE Holdings from August 2005 to August 2007.  Fowler was elected Vice Chairman and CFO of EPCO in May 2010, and has served as a director since December 2007.  Finally, Fowler served as President and CEO of EPCO from December 2007 to May 2010, and as CFO from April 2005 to December 2007.

62.     Similarly, individual defendant Bulawa served as SVP and Treasurer of Enterprise GP since October 2009, having previously served as Vice President and Treasurer from July 2007 to October 2009.

63.     Individual defendant Snell served as a director of Enterprise GP from June 2000 until February 2006, and served as a director of Texas Eastern Products Pipeline Company, LLC from January 2006 until its merger with a subsidiary of Enterprise in October 2009.

64.     In sum, these individual defendants' dual loyalties to Enterprise and Duncan Energy make it impossible for them to have considered the fairness of the Proposed Acquisition (and the Proposed Consideration being offered pursuant thereto) in a way that maximizes the benefits to the Company and its unitholders, and further renders them incapable of considering the fairness of any competing offer or third-party acquisition proposal should one come to pass.

65.     The LPA sets out the procedures concerning a potential merger involving Duncan Energy. Pursuant thereto, DEP must approve the Proposed Acquisition.  Specifically, Section 14.2 provides that  a "[m]erger, consolidation or conversion of [Duncan Energy] pursuant to this Article XIV requires the prior consent of the General Partner and Special Approval …." LPA, Section 14.2.

66.     Accordingly, because DEP must approve the Proposed Acquisition, and Enterprise controls 100% of DEP through EPO and a majority of DEP's directors are current or former Enterprise directors and/or officers, an affirmative vote in favor of the Proposed Acquisition is assured without regard to the fairness of the terms.  In fact, as disclosed in the Merger Agreement,

both the Duncan ACG Committee and the full Board have already formally approved the Proposed Acquisition.

67.     Furthermore, under the LPA, upon DEP's approval of the Proposed Acquisition, any business combination must be submitted to a vote of limited partners. Specifically, Section 14.3(a) provides:

> Except as provided in <u>Section 14.3(d)</u> and <u>Section 14.3(e)</u>, the General Partner, upon its approval of the Merger Agreement or the Plan of Conversion, shall direct that the Merger Agreement or the Plan of Conversion be submitted to a vote of Limited Partners, whether at a special meeting or by written consent, in either case in accordance with the requirements of <u>Article XIII</u>. A copy or a summary of the Merger Agreement or the Plan of Conversion, as the case may be, shall be included in or enclosed with the notice of a special meeting or the written consent.

LPA, Section 14.3(a).

68.     Moreover, the LPA provides that a business combination must be approved by an affirmative vote of the holders of a majority of Duncan Energy's units.  Specifically, Section l4.3(b) of the LPA states: "the Merger Agreement or Plan of Conversion shall be approved upon receiving the affirmative vote or consent of the holders of a majority of Outstanding Units."

69.     As set forth above, Enterprise, through its affiliates, beneficially owns 58.5% of Duncan Energy.   Therefore, in any transaction proposed by Enterprise or one of its affiliates/subsidiaries (such as the Proposed Acquisition), an affirmative vote by a majority of Duncan Energy's unitholders is guaranteed.  In fact, as disclosed in the Merger Agreement, Enterprise has in already committed, and is contractually obligated to vote its 58.5% beneficial interest in Duncan Energy in favor of the Proposed Acquisition pursuant to the Voting Agreement.

70.     Duncan Energy and the Individual Defendants have breached the LPA and violated the implied contractual covenant of good faith and fair dealing owed to Duncan Energy common unitholders by operating on both sides of the deal, therefore permitting Enterprise to set the Proposed Consideration at a level that does not reflect the true intrinsic value of the Company, to include terms

in the Merger Agreement that prohibit solicitation of competing bids and discourage unsolicited third-party proposals as outlined below, and ultimately to assure that Enterprise acquires the Company at a price that inadequately compensates Duncan Energy's common unitholders while serving Enterprise's agenda of obtaining valuable assets at an unfair and unreasonable price.

71.     Accordingly, the Proposed Acquisition is wrongful, unfair, and harmful to the Company's public unitholders, and represents an attempt to deny Plaintiffs and the other members of the Class their right to obtain a fair and proportionate share of Duncan Energy's valuable assets, future growth in profits, earnings, distributions, and dividends.  As a result of these actions, Plaintiffs and the other members of the Class will be damaged in that they will not receive their fair portion of the value of Duncan Energy and will be prevented from obtaining the intrinsic fair value of their equity ownership of the Company.

72.     Unless the Proposed Acquisition is enjoined by the Court, DEP and the Individual Defendants will continue to breach the LPA and violate the implied contractual covenant of good faith and fair dealing, aided and abetted by Enterprise and its affiliates, to the irreparable harm of Plaintiffs and the Class.

## THE PRECLUSIVE DEAL PROTECTION DEVICES

73.     The Merger Agreement unreasonably and unfairly restricts the Company from soliciting competitive offers and eliminates the potential for a market check on Enterprise's offer. By failing to negotiate or obtain the best available price for Duncan Energy, the Individual Defendants have not only breached the implied covenant of good faith and fair dealing but have also violated their express contractual obligations under the "fair and reasonable" standard for conflicted transactions under both the Comparable Transactions Clause and the Third Parties Clause of the LPA as defined above.

- 26 -

74.     First, the Merger Agreement fails to include a reasonable "go shop" period.  In fact, under Section 6.6 of the Merger Agreement, Duncan Energy is subject to a no-solicitation clause that prohibits the Company from actively seeking a superior offer for its unitholders.  Specifically, Section 6.6(a) provides that:

> Neither Duncan GP nor Duncan shall, and they shall use their commercially reasonable best efforts to cause their Representatives not to, directly or indirectly, (i) initiate, solicit, knowingly encourage or facilitate any inquiries or the making or submission of any proposal that constitutes, or may reasonably be expected to lead to, an Acquisition Proposal,[6] or (ii) participate in any discussions or negotiations regarding, or furnish to any person any non-public information with respect to, any Acquisition Proposal. Notwithstanding the foregoing, nothing contained in this Agreement shall prohibit Duncan or any of its Representatives from furnishing any information or data pertaining to Duncan, or entering into or participating in discussions or negotiations with, any person that makes an unsolicited written Acquisition Proposal that did not result from a knowing and intentional breach of this Section 6.6 (a "Receiving Party"), if (i) the Duncan Audit Committee after consultation with its outside legal counsel and financial advisors, determines in good faith (A) that such Acquisition Proposal constitutes or is likely to result in a Superior Proposal, and (B) that failure to take such action would be inconsistent with its duties under the Duncan Existing Partnership Agreement and applicable Law and (ii) prior to furnishing any such non-public information to such Receiving Party (including any information pertaining to Duncan Subsidiaries in which Partners has an equity interest or transactions to which Partners is a party), Duncan receives from such Receiving Party an executed Confidentiality Agreement.

Merger Agreement, Section 6.6

75.     This no-solicitation provision effectively prohibits the Company from properly shopping itself in order to attain the maximum consideration for its unitholders.  Moreover, when

---

[6] "Acquisition Proposal" is defined in the Merger Agreement as any proposal or offer from or by any person other than Enterprise, EPD GP or MergerCo relating to: (a) any direct or indirect acquisition of (i) more than 20% of the assets of Duncan Energy and its subsidiaries or the outstanding equity securities of Duncan Energy, or (ii) a business or businesses that constitute more than 20% of the cash flow, net revenues, net income or assets of Duncan Energy and its subsidiaries, taken as a whole; or (b) any tender offer or exchange offer, as defined under the 1934 Act, that, if consummated, would result in any person beneficially owning more than 20% of the outstanding equity securities of Duncan Energy; or (c) any merger, consolidation, business combination, recapitalization, liquidation, dissolution or similar transaction involving Duncan Energy, other than the merger (hereinafter "Acquisition Proposal").

this provision is considered in conjunction with the aforementioned Voting Agreement which locks-up 58.5% of the vote in favor of the Proposed Acquisition, it is evident that the Individual Defendants, Duncan Energy, and DEP, in agreeing to the Proposed Acquisition, were not seeking to maximize value for Duncan Energy unitholders but were instead focusing on ensuring that a deal with their preferred bidder – Enterprise – was completed without any setbacks from potential third-party acquirors.

76.     Moreover, any unsolicited competing bidder would have to go through the great expense of conducting due diligence and formulating a proposal within a very limited timeframe.  In particular, Section 6.6(c) of the Merger Agreement requires Duncan Energy to provide Enterprise with written and oral notice within twenty-four hours of its receipt of an unsolicited Acquisition Proposal or any matter that may give rise to a change in the Duncan ACG Committee's recommendation in favor of the Proposed Acquisition, including informing Enterprise of the identity of the person making or submitting the unsolicited Acquisition Proposal, and the material terms and conditions thereof.

77.     In addition, even if Duncan Energy receives an unsolicited superior proposal to the deal with Enterprise ("Superior Proposal"),[7] Section 6.6(b) of the Merger Agreement prevents the Board from terminating the Proposed Acquisition and accepting it unless, inter alia, the Duncan ACG Committee: (i) determines in good faith that the failure to do so would reasonably be expected

---

[7] A "Superior Proposal" is defined in the Merger Agreement as follows: "any bona fide Acquisition Proposal (except that references to 20% within the definition of 'Acquisition Proposal' shall be replaced by '50%') made by a third party on terms that the Duncan Audit Committee determines, in its good faith judgment and after consulting with its or Duncan's financial advisors and outside legal counsel, and taking into account the financial, legal, regulatory and other aspects of the Acquisition Proposal (including any conditions to and the expected timing of consummation and any risks of non-consummation), to be more favorable to the holders of Duncan Common Units, from a financial point of view, than the Merger …."

- 28 -

to be inconsistent with its duties under the LPA; (ii) provides Enterprise with three-days written notice of the Superior Proposal, including the material terms and conditions, the identity of the person making the Superior Proposal, copies of the agreements intended to effectuate the Superior Proposal, and copies of documents provided to the offeror to date, and (iii) provides Enterprise notice and an additional three business days for each subsequent amendment to the terms of the Superior Proposal, presumably to permit negotiation and counteroffer.

78.    Finally, even if a tenacious bidder made an unsolicited Superior Proposal and made it through for active consideration by Duncan Energy, the bidder would still face negotiations with a heavily conflicted management team who are unwilling or unable to act in the interests of Duncan Energy's unitholders and are instead pushing to close a deal with Enterprise.

79.    There is no reason to believe that either the Duncan ACG Committee or the full DEP Board conducted any sort of market check with respect to the Proposed Acquisition or the true value of Duncan Energy as an acquisition target because, inter alia, Defendants crafted, and the Individual Defendants approved, a Merger Agreement that prohibits solicitation of competing offers and discourages unsolicited bids. As such, the Individual Defendants, aided and abetted by Enterprise and its affiliates, have failed to maximize unitholder value and have thereby breached their express and implied duties under the LPA as outlined herein.

80.    The Proposed Acquisition is inherently unfair to Duncan Energy's public unitholders. By entering into a Merger Agreement on terms that are unfair and inadequate, by failing to maximize the value of Duncan Energy to its unitholders, and by failing to resolve readily apparent conflicts that make it impossible for the Individual Defendants to serve the interests of Duncan Energy's unitholders, Defendants have breached, or aided and abetted the breaches of, the express and implied terms and contractual duties owed by them to Duncan Energy and its unitholders under the terms of

the LPA. Plaintiffs and the Class will suffer irreparable harm if the Court does not enjoin the Proposed Acquisition, or rescind the Proposed Acquisition in the event it is ultimately consummated.

## CLASS ACTION ALLEGATIONS

81.     Plaintiffs bring this action for themselves and on behalf of all holders of Duncan Energy Units (the "Class").  Excluded from the Class are the Defendants and any person, firm, trust, corporation, or other entity related to or affiliated with any defendant.

82.     This action is properly maintainable as a class action.

83.     The Class is so numerous that joinder of all members is impracticable.  According to the Merger Agreement, there were 57,770,528 Duncan Energy Units outstanding as of April 29, 2011.

84.     Questions of law and fact that are common to the Class and which predominate over questions affecting any individual Class member include, among others:

(a)     whether the Defendants have violated §14(a) and §20(a) of the 1934 Act and SEC Rule 14a-9 promulgated thereunder;

(b)     whether Duncan Energy, DEP, and/or the Individual Defendants have breached their express and/or implied contractual duties under the LPA;

(c)     whether Defendants have aided and abetted Duncan Energy's, DEP's, and/or the Individual Defendants' breach of their express and/or implied contractual duties under the LPA; and

(d)     whether Plaintiffs and the Class will be irreparably harmed if Defendants' conduct, as complained of herein, continues.

85.     Plaintiffs are committed to prosecuting this action and have retained competent counsel experienced in litigation of this nature.  Plaintiffs' claims are typical of the claims of the other members of the Class and Plaintiffs have the same interests as the other members of the Class.

Accordingly, Plaintiffs are adequate representatives of the Class and will fairly and adequately protect the interests of the Class through their chosen counsel.

86.     The prosecution of separate actions by individual members of the Class would create the risk of inconsistent or varying adjudications with respect to individual members of the Class that would establish incompatible standards of conduct for the Defendants, or adjudications with respect to individual members of the Class that would, as a practical matter, be dispositive of the interests of the other Class members not subject to the adjudications or substantially impair or impede their ability to protect their interests.

87.     The Defendants have acted, or refused to act, on grounds generally applicable to the Class with respect to the harmful conduct complained of herein, thereby making the injunctive relief sought by Plaintiffs on behalf of the Class appropriate.

88.     Plaintiffs anticipate that there will be no difficulty in the management of this litigation.  A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## COUNT I

### Against the Individual Defendants, Duncan Energy, DEP, and Enterprise for Violations of §14(a) of the 1934 Act and Rule 14a-9 Promulgated Thereunder

89.     Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

90.     During the relevant period, the Individual Defendants, Duncan Energy, DEP, and Enterprise disseminated the false and misleading S-4 specified above which failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

91.     The S-4 was prepared, reviewed, and/or disseminated by the Individual Defendants, Duncan Energy, DEP, and Enterprise.  It misrepresented and/or omitted material facts, including material information about Company's financial forecasts and the actual intrinsic value of the Company as determined by Morgan Stanley.

92.     In so doing, the Individual Defendants, Duncan Energy, DEP, and Enterprise made untrue statements of material facts and omitted to state material facts necessary to make the statements that were made not misleading in violation of §14(a) of the 1934 Act and SEC Rule 14a-9 promulgated thereunder.  By virtue of their positions within the Company, the Individual Defendants were aware of this information and of their duty to disclose this information in the S-4.

93.     The Individual Defendants, Duncan Energy, DEP, and Enterprise were at least negligent in filing the S-4 with these materially false and misleading statements.

94.     The omissions and false and misleading statements in the S-4 are material in that a reasonable unitholder would consider them important in deciding how to vote on the Proposed Acquisition.  In addition, a reasonable investor would view a full and accurate disclosure as significantly altering the "total mix" of information made available in the S-4 and in other information reasonably available to unitholders.

95.     By reason of the foregoing, the Individual Defendants, Duncan Energy, DEP, and Enterprise have violated §14(a) of the 1934 Act and SEC Rule 14a-9(a) promulgated thereunder.

96.     Because of the false and misleading statements in the S-4, Plaintiffs are threatened with irreparable harm, rendering money damages inadequate.  Thus, injunctive relief is appropriate to ensure the Individual Defendants', Duncan Energy's, DEP's, and Enterprise's misconduct is corrected.

## COUNT II

### Against the Individual Defendants for Violation of §20(a) of the 1934 Act

97.     Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

98.     The Individual Defendants acted as controlling persons of Duncan Energy within the meaning of §20(a) of the 1934 Act as alleged herein.  By virtue of their positions as officers and/or directors of DEP, Duncan Energy's general partner, and participation in and/or awareness of the Company's operations and/or intimate knowledge of the false statements contained in the S-4 filed with the SEC, they had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiffs contend are false and misleading.

99.     Each of the Individual Defendants was provided with or had unlimited access to copies of the S-4 and other statements alleged by Plaintiffs to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

100.     In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company, and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.  In addition, as the S-4 sets forth at length, and as described herein, the Individual Defendants were all involved in negotiating, reviewing, and approving the Proposed Acquisition.  The S-4 purports to describe the various issues and information that they reviewed and considered, descriptions which must have had input from the Individual Defendants. The S-4 at issue contains the unanimous recommendation of each of the Individual Defendants to approve the Proposed Acquisition.  They were thus directly involved in the making of this document.

101.    By virtue of the foregoing, the Individual Defendants have violated §20(a) of the 1934 Act.

102.    As set forth above, the Individual Defendants had the ability to exercise control over and did control a person or persons who have each violated §14(a) and SEC Rule 14a-9, by their acts and omissions as alleged herein.  By virtue of their positions as controlling persons, these Individual Defendants are liable pursuant to §20(a) of the 1934 Act.  As a direct and proximate result of the Individual Defendants' conduct, Duncan Energy and its unitholders will be irreparably harmed.

## COUNT III

### Against the Individual Defendants, Duncan Energy, and DEP for Breach of Express and Implied Contractual Duties

103.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

104.    DEP, as Duncan Energy's general partner, and the Individual Defendants, as directors of Duncan Energy's general partner and its controller, owe Plaintiffs and the Class express and implied contractual duties as set forth in the LPA.

105.    As set forth above, DEP and the Individual Defendants have breached and continue to breach express obligations under the LPA and implied duties of good faith and fair dealing by causing Duncan Energy to enter into the Merger Agreement and pursue a merger that is not fair and reasonable and is being undertaken in bad faith.

106.    Compliance with the express and implied contractual obligations would require:

(a)    undertaking an appropriate evaluation of the Company's true value as a merger or acquisition candidate and ensuring that the Proposed Acquisition included a fair valuation of the Company and the Proposed Consideration reflected the true intrinsic value of the Company;

(b)    acting independently to protect the interests of the Duncan Energy unitholders;

(c)    adequately ensuring that no conflicts of interest exist between the Individual Defendants' own interests and their obligations to Duncan Energy's unitholders, and if such conflicts exist, to ensure that all conflicts are resolved in the best interests of Duncan Energy's public unitholders; and

(d)    actively evaluating the Proposed Acquisition and engaging in meaningful auction and/or market checks with third parties in an attempt to maximize value on any sale of the Company

107.    By agreeing to the Proposed Acquisition, DEP and the Individual Defendants have accepted an unreasonably low price for Duncan Energy that does not adequately reflect the Company's true and intrinsic value, have failed to act independently in the interest of Duncan Energy's public unitholders, have permitted conflicts of interest and Enterprise's control to influence a fair, reasonable, and good faith assessment of the Proposed Acquisition, and have failed to inform themselves of the Company's true value as a merger candidate or perform sufficient market checks to maximize public unitholder value.

108.    Moreover, the Individual Defendants have caused materially misleading and incomplete information to be disseminated to the Company's public unitholders. The Individual Defendants have an obligation to be complete and accurate in their disclosures.

109.    The S-4 fails to disclose material information, including financial information and information necessary to prevent the statements contained therein from being misleading.

110.    The misleading omissions and disclosures by Defendants concerning information and analyses presented to and considered by the Board and its advisors affirm the inadequacy of

disclosures to the Company's unitholders. Because of Defendants' failure to provide full and fair disclosure, Plaintiffs and the Class will be stripped of their ability to make an informed decision on whether to vote their units in favor of the Proposed Acquisition, and thus are damaged thereby.

111.    As a result of the breaches of express and implied contractual duties by these defendants, Plaintiffs and the Class will suffer irreparable injury through the consummation of the Proposed Acquisition on unfair terms.

112.    Unless the Court enjoins the conduct of these defendants, they will continue to breach the express and implied duties owed to Plaintiffs and the other Class Members.

113.    Plaintiffs and the Class have no adequate remedy at law.

## COUNT IV

### Against all Defendants for Aiding and Abetting Breach of Express and Implied Contractual Duties

114.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

115.    As set forth above, DEP and the Individual Defendants owe Duncan Energy's public unitholders express and implied contractual duties and obligations that DEP and the Individual Defendants breached with respect to the Proposed Acquisition.

116.    Each defendant knowingly participated in and assisted the foregoing breaches of express and implied contractual duties by directly or indirectly causing DEP, the Individual Defendants, and Duncan Energy to pursue and enter into the Proposed Acquisition, which, without such aid, would not have occurred. Each defendant has acted and is acting with knowledge of, or with reckless disregard to, the fact that DEP and the Individual Defendants are breaching their contractual duties.

117.   As such, unless Defendants' conduct is enjoined by the Court, they will continue to aid DEP and the Individual Defendants' breaches of express and implied contractual duties to Plaintiffs and the other Class Members.

118.   Absent injunctive relief, Plaintiffs and the Class will suffer irreparable harm as a result of Defendants' participation and assistance in DEP and the Individual Defendants' breaches of contractual duties, for which Plaintiffs and the Class have no adequate remedy at law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs demand injunctive relief, in their favor and in favor of the Class, and against the Individual Defendants as follows:

A.   Declaring that this action is properly maintainable as a class action;

B.   Certifying Plaintiffs as Class representatives and their chosen counsel as Class Counsel;

C.   Declaring that DEP and the Individual Defendants have breached, and that all Defendants have aided in the breach, of the express and implied contractual duties owed to Duncan Energy's public unitholders under the LPA;

D.   Enjoining the Defendants, their agents, counsel, employees, and all persons acting in concert with them from consummating the Proposed Acquisition, unless and until they comply with their duties including those contained under §14(a) and §20(a) of the 1934 Act to provide unitholders with all material information concerning the Proposed Acquisition, the Company's financial projections, the actual intrinsic value of the Company and the financial analyses prepared by Morgan Stanley.

E.   Directing Defendants to exercise their duties to obtain a transaction that is in the best interests of Duncan Energy and its unitholders;

F.      Rescinding, to the extent already implemented, the Proposed Acquisition or any of the terms thereof;

G.      Awarding Plaintiffs the costs and disbursements of this action, including reasonable attorneys' and experts' fees; and

H.      Granting such other and further equitable relief as this Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a trial by jury.

DATED:  July 5, 2011                KENDALL LAW GROUP, LLP
                                    JOE KENDALL, Texas Bar No. 11260700
                                    JAMIE J. MCKEY, Texas Bar No. 24045262


                                    /s/ Joe Kendall
                                    JOE KENDALL

                                    3232 McKinney, Suite 700
                                    Dallas, TX  75204
                                    Telephone: (214) 744-3000
                                    Facsimile: (214) 744-3015
                                    jkendall@kendalllawgroup.com
                                    jmckey@kendalllawgroup.com

                                    ROBBINS UMEDA LLP
                                    BRIAN J. ROBBINS
                                    STEPHEN J. ODDO
                                    JUSTIN D. RIEGER
                                    LAUREN E. ROSNER
                                    600 B Street, Suite 1900
                                    San Diego, CA 92101
                                    Telephone: (619) 525-3990
                                    Facsimile: (619) 525-3991
                                    brobbins@robbinsumeda.com
                                    soddo@robbinsumeda.com
                                    jrieger@robbinsumeda.com
                                    lrosner@robbinsumeda.com

GOLDFARB BRANHAM LLP
HAMILTON LINDLEY
Saint Ann Court
2501 N. Harwood Street, Suite 1801
Dallas, TX 75201
Telephone: (214) 583-2257
Facsimile: (214) 583-2234
hlindley@goldfarbbranham.com

Counsel for Plaintiffs

623128

# CERTIFICATION OF PLAINTIFF
## PURSUANT TO FEDERAL SECURITIES LAW

Merle Davis ("Plaintiff") declares as to the claims asserted, or to be asserted, under the federal securities laws, that:

1.      Plaintiff has reviewed the Class Action Complaint and has retained Robbins Umeda LLP as counsel in this action for all purposes.

2.      Plaintiff did not acquire the security that is the subject of this action at the direction of Plaintiff's counsel or in order to participate in any private action or any other litigation under the federal securities laws.

3.      Plaintiff has made the following transaction(s) during the Class Period in the securities that are subject of this action:

| SECURITY | TRANSACTION (Purchase/Sale) | QUANTITY | TRADE DATE | PRICE PER SHARE/SECURITY |
|----------|------------------------------|----------|------------|--------------------------|
| DEP | 1/30/2007 | 100 | | 21.00 |
| DEP | 1/31/2007 | 400 | | 22.57 |
| DEP | 7/17/2007 | 500 | | 28.51 |
| | | | | |

4.      Plaintiff is willing to serve as a representative party on behalf of a class, including providing testimony at deposition and trial, if necessary, and Plaintiff is willing to serve as a lead plaintiff, a lead plaintiff being a representative party who acts on behalf of other class members in directing the action.

5.      Plaintiff has not sought to serve or served as a representative party for a class in an action filed under the federal securities laws within the past three years, unless otherwise stated in the space below: _____

6.      Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the Court.

7.      Plaintiff represents and warrants that he is fully authorized to enter into and execute this certification.

I declare under penalty of perjury that the foregoing is true and correct. Executed this _1st____ day of July, 2011.

_____
MERLE DAVIS


Please return by fax to: 214-583-2234

Plaintiffs Certification of Investment of Donald Weilersbacher

I, Donald Weilersbacher, hereby certify that the following is true and correct to the best of my knowledge, information and belief:

1.      I have reviewed the Complaint in this action and authorize the filing thereof.

2.      If chosen, I am willing to serve as a representative party on behalf of the class (the "Class") as defined in the Complaint, including providing testimony at deposition and trial (if necessary).  I am willing to participate on an executive committee of shareholders.

3.      Plaintiff's transaction in Duncan Energy security that is the subject of this action is:

| # SHARES PURCHASED | DATE PURCHASED | PRICE PER SHARE | CLASS OF STOCK (e.g. COMMON) | IF SOLD, # OF SHARES SOLD | DATE SOLD (if sold) | PER SHARE SOLD PRICE |
|---|---|---|---|---|---|---|
| 1000 | 1/20/2009 | 16.38 | COMMON | | | |
| | | | | | | |
| | | | | | | |

4.      I did not purchase these securities at the direction of my counsel, or in order to participate in a lawsuit under the Securities Exchange Act of 1934.

5.      During the three-year period preceding the date of the Certification, I have not sought to serve, nor have I served, as a representative to any party or on behalf of any class in any action arising under the Securities Exchange Act of 1934.

6.      I will not accept any payment if chosen to serve as a representative party on behalf of the Class beyond my pro rata share of an award to the Class, or as otherwise ordered and approved by the Court.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on the ___ day of July ___, 2011.

_Donald Weilersbacher_
Donald Weilersbacher